COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-04-164-CR

 

 

AMANDA LEE DOYLE                                                           APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM THE 367TH
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

 

I.  Introduction

 








A jury convicted Appellant Amanda Lee Doyle of
capital murder, and the trial court sentenced her to life in prison.  In five issues, Doyle complains that the
evidence is factually insufficient to support her conviction, that the trial
court erred by admitting into evidence a gruesome photograph and by limiting
voir dire questioning as to the range of punishment, and that reversible error
occurred when an absolutely disqualified juror sat on the jury and when the
trial court refused to allow the defense to review that juror=s
personal information card.  We will
affirm.

II.  Factual Background

A.     Non-Accomplice Witness Testimony

Cartrage Jones testified that on September 15,
2002, a group of his friendsCincluding
Dale Ponce-Duron, Kesey Frank, Justin Ebert, Jerry Jackson, and Jackson=s
girlfriend, Stephanie TacinaCgathered
at the Mack Park Apartments to drink and watch a football game.  Jerry and Stephanie argued, and Jerry shook
Stephanie by the shoulders, causing her to hit her head on a wall and to fall
to the ground.  Cartrage said that
Stephanie did not seem to be badly hurt. 
Jerry subsequently left with Athe guys@ to go
to the store to buy beer.  When the men
returned to the apartments, they saw fire trucks, an ambulance, and police
cars.  Police eventually arrested Jerry.  








Cartrage said that Doyle, the mother of Jerry=s baby,
and Tymeshia Turner arrived in a white, four-door Hyundai and saw that Jerry
was handcuffed.  Cartrage stated that
Doyle was upset by Jerry=s arrest and blamed Stephanie
for it.  Cartrage testified that Doyle
repeatedly said, AWe=re going
to get that bitch.@ 
He stated that Dale, Kesey, Justin, and Tymeshia were also upset and
that he thinks everyone in the group was saying that they were Agoing to
get that bitch,@ meaning Stephanie.  Cartage heard Doyle say that the group was
going to the hospital to find Stephanie. 
He testified that he told Doyle Anot to
go up there messing with that girl,@ but
Doyle did not listen to him.  Doyle
handed her baby to Kelley Hughes, a friend who lived at the Mack Park
Apartments, and Dale, Kesey, Justin, Tymeshia and Doyle all got in Doyle=s car
and left. 

Lacey Lee, the assistant manager of the Mack Park
Apartments at the time of this incident, testified that she remembered hearing
a female voice cussing or yelling in the late afternoon and later saw two
police cars in the parking lot.  She saw
one gentleman in handcuffs and two females whom she had not seen before
standing in the parking lot.  She
described the two femalesCone was black and skinny; the
other was white, bigger, and had a baby in her arms.  She also noticed a group of five people
pacing and yelling profanity; she could tell that they were very angry about
something.  Lacey noted that after the
police left, Doyle was very angry; she was yelling at the other female.  Lacey said that Doyle was pacing and
repeating, AWe=re going
to get that bitch.@ 













Ivan Holbert testified that his girlfriend on
September 15, 2002 was Kelley Hughes and that he went to her apartment on that
date.  Cartrage told Ivan something that
made him go outside.  Once outside, Ivan
saw the police run a warrant check and arrest Jerry because he had an
outstanding warrant. He saw Doyle and said that she was crying and upset and
wanted to know where Stephanie had been taken. 
Ivan said that he told Doyle to leave Stephanie alone and that Stephanie
was not the reason for Jerry=s
arrest.  Ivan recalled Doyle saying that
if she found Stephanie, she was Agoing to
beat her up.@ 
Ivan and Kelley kept Doyle=s baby
because Doyle, Tymeshia, Dale, Kesey, and Justin left in Doyle=s
car.  Ivan testified that as Dale got
into the car he said:  AI put
this on my HLV [high life villain] until I die. 
When I find Stephanie, I=m going
to kill her.@ 
The group returned thirty minutes later to drop off a baby bag, and
Doyle said that she would be back to get her baby the next day. Kelley Hughes testified that she lived at the
Mack Park Apartments in September 2002 and that she heard a thump outside
during the late afternoon of September 15, 2002.  After checking on her kids, she went outside
and saw a lady, who was wearing denim shorts and a green shirt, lying on the
ground.  Kelley asked Kesey, a black man
who was outside, what had happened, and he said that the girl had hit her head
on the wall.  Kelley took the girl into a
nearby apartment, and the girl ended up leaving, walking towards the police
station.     After Kelley went back to her apartment, she heard the sound of
approaching alarms and sirens.  Later,
she saw that police had arrived and handcuffed Jerry, Kesey, and a white
man.  The police arrested Jerry but let
the other men go.  Kelley remembered that
by this time Doyle and Tymeshia had arrived in a white four-door car and she
said they were present when Jerry was arrested. 
Kelley said that Doyle and Tymeshia were mad and upset and that Doyle
wanted to know why Jerry had been arrested. 
Kelley stated that people in the group were yelling that they were going
to beat up Stephanie.  The group left,
and Kelley kept Doyle=s baby.  Kelley did not hear anyone say that he or she
was going to kill Stephanie. 

Reese Morgan testified that on the night in
question, he went to Denton to hang out with Jerry.  He could not find Jerry, so he eventually
called Doyle. Doyle returned Reese=s call
while she was with the group.  Doyle told
him that Jerry had been arrested and Athat
something bad had happened.@  Doyle was worried that her mom might call
Reese looking for her and asked Reese to tell her mom that she and her friends
had been with Reese because she did not want her mom to find out that Jerry was
in jail.  The next day, Reese gave Doyle
$900 for Jerry=s bail. 








Tasia Hoffman testified that she is Doyle=s friend
and that she stayed at Doyle=s house
the night of September 14, 2002.  The
next day around 2:00 or 3:00 p.m., Doyle, the baby, and Tymeshia took Tasia
home.  Around 11:30 p.m., on September 15,
2005 Doyle knocked on Tasia=s
bedroom window.  Tasia went to the door
and let Doyle in, and Doyle said, AStephanie=s in the
car.  Come outside and get your paper,@ which
Tasia understood to mean, ACome
outside and fight her.@ 
Doyle told Tasia to look at her hands; Tasia saw that Doyle=s
knuckles were red with blood.  

They went outside to Doyle=s car;
Tymeshia was in the driver=s seat
and Justin, Kesey, Dale, and Stephanie were in the back seat.  Tasia saw Stephanie and asked what had
happened.  Tymeshia responded that
Stephanie had gotten Jerry Alocked
up.@  Tasia noticed that Stephanie=s head
was on the seat between Dale and Kesey and that she was wearing bleached denim
shorts and a green halter top.  Tasia saw
that Stephanie=s hair was orange, like it had
blood in it, and that she had bruises, a burn, and whelps on her back.  Tasia thought that Stephanie @looked
like somebody was holding onto her, not letting her move[,] like she was trying
to move[,] but she couldn=t.@  Tasia thought that Stephanie sounded like she
was trying to breathe and was gasping for air. 
Tasia said that Doyle asked her if they could leave Stephanie at Tasia=s house,
and Tasia told her no.  Doyle then asked
Tasia to come with them, but Tasia=s dad
came outside and told her to go inside. 
Doyle got in the car, and the group left. 








Tasia said that Doyle called her two or three
times the next day.  Doyle came to Tasia=s house
at around midnight the next day.  Tasia
noticed that Doyle was distraught, in shock, and scared when she arrived.  They went to see if Stephanie=s body
was still at a nearby trailer park where Doyle said the group had dumped
it.  Tasia said that she did not look at
the body; she covered her head with her shirt. 
Doyle said, AOh, my God, she=s still
there,A and
then she started crying and said that Stephanie was dead.  Tasia stated that Doyle did not want
Stephanie to die. 

Doyle then told Tasia about the events from the
night before, including that Stephanie had been hit in the head with a brick
and beaten and that the men in the back seat with Stephanie had burned her with
cigarettes, choked her, and hit her with a gun. 
Doyle told Tasia that she had hit Stephanie.  Doyle told Tasia that Kesey and Dale had
dragged Stephanie out of the car by a belt, cut her throat, and stabbed her in
the stomach with scissors.  Doyle said
that Kesey had tried to break Stephanie=s
neck.  Doyle told Tasia that they took
the padding out of her car seats because they were bloody, that they obtained
bleach from a friend named Brian Dunnelly so that they could clean the car, and
that they burned all the Astuff.@ 

After going out to the vacant lot near the
trailer park with Doyle, Tasia called her ex-boyfriend, Calvin.  Calvin and his friend Dwayne arrived at Tasia=s about
3:00 a.m., and the three of them went to look at Stephanie=s body.
Calvin then called the police. 








Detective Eddie Barrett testified that he
received a deceased persons call on September 17, 2002.  He went to a vacant lot and found a deceased
female wearing blue jean shorts, lying next to a pile of dirt.  He noticed that the victim had multiple stab
wounds in the abdomen, a large laceration on her neck, and some burn marks across
her face.  Detective Barrett spoke with
Calvin, Dwayne, and Tasia and developed a list of suspects.  Detective Barrett also spoke with Doyle and
obtained consent to search her white Hyundai. 
He subsequently sent the car to be searched for any hair, blood, and
fingerprints that might be present.  At
Dale=s house,
Detective Barrett found a piece of landscape brick and a grill.  He found another piece of landscape brick at
Denton Regional Hospital.  He noted that
the hospital surveillance tape showed Dale, Tymeshia, and Doyle at the
hospital. 

Detective Chris Kemp testified that he responded
to a dispatch on September 17, 2002 regarding a deceased person.  He testified that Stephanie had a very deep
laceration from one side of her neck to the other side, numerous puncture
wounds to her stomach area, and bruising on her arms.  He also saw the four-door pearl white Hyundai
owned by Doyle.  Detective Kemp said that
there was enough blood in the back seat area of the vehicle to cause him to
suspect that Stephanie had been killed in the vehicle rather than in the field
where her body was discovered. 








Constance Patton, a forensic DNA analyst,
testified that she analyzed the vehicle for blood stains.  She stated that the blood stains in the car
matched Stephanie=s blood profile and concluded
that Stephanie was the donor of the blood found in Doyle=s
Hyundai.  Patton noted that no blood was
recovered from the front seat and that no blood was detected on the bricks. 

Patricia Eddings, also a trace analyst, testified
that the brick found at the hospital had no hair attached to it but that the
brick found in Dale=s backyard had a single hair
stuck to it.  She stated that the hair on
the brick from Dale=s backyard had the same
microscopic characteristics as Stephanie=s hair,
and she opined that the hair on the brick could be Stephanie=s. 








Dr. Gary Sisler, who works at the Tarrant County
Medical Examiner=s Office, testified regarding
his autopsy on Stephanie=s body.  He found a large cut wound on Stephanie=s neck,
other cut wounds on the left side of her neck, two cut wounds on the left side
of her head, and bruises on her upper and lower extremities.  He described the large cut wound on Stephanie=s neck
as seven inches wide and an average of one and a half inches deep.  He said that the large cut wound was fatal in
and of itself, that scissors could have caused the wound, and that the wound
was inflicted while Stephanie=s heart
was still beating.  He said that he found
eleven stab wounds, averaging four and a half inches deep, that were inflicted
after her heart stopped.  Dr. Sisler
explained that one of these stab wounds penetrated Stephanie=s
abdominal aorta and would have been fatal. 
He noted a burned area on Stephanie=s
face.  Dr. Sisler did not note any
cigarette burns in his report; however, he concluded at trial that Stephanie
had suffered cigarette burns to her face because autopsy photos show the burned
skin cracking and flaking.  Dr. Sisler
described the blunt-force injury to Stephanie=s skull
and opined that a brick could have caused that injury. He said that there was
no evidence that Stephanie was choked with a belt or strangled with a shirt
because he found no marks on her neck. 
He indicated, however, that the autopsy would not have detected efforts
to break Stephanie=s neck.  He ruled Stephanie=s cause
of death as multiple sharp-force injuries and indicated that the manner of
death was homicide. 

B.     Accomplice Witness Testimony

Tymeshia Turner was the final witness and the
only accomplice witness who testified.[1]  Tymeshia testified that she was best friends
with Doyle and went to school with her. 
Before September 15, 2002, Tymeshia had heard Doyle make threats against
Stephanie; specifically, Doyle wanted to fight Stephanie and Aget her
out of the picture@ because Doyle wanted to be with
Jerry, who was dating Stephanie but was the father of Doyle=s baby. 








On September 15, 2002, Tymeshia was with Doyle,
and they went to find Jerry because he was not returning Doyle=s
pages.  When they got to the Mack Park
Apartments, they saw that Jerry was handcuffed. 
Tymeshia stated that Doyle was really mad and upset Abecause
[Jerry] was over there [at the Mack Park Apartments] with Stephanie@ and
that because Ahe put his hands on Stephanie,
he was going to jail, so it was all her fault.@  Doyle told Tymeshia, AI=m going
to kill that bitch@; however, Tymeshia claimed that
she did not know that Doyle meant it. 
During this time, Tymeshia, Dale, and Kesey said things to incite Doyle
so that she would fight Stephanie.  Doyle
left her baby with Kelley and Ivan, drove the group in her car to her house to
get baby things to take back to Kelley, and then planned to go to the hospital
to fight Stephanie. 








Tymeshia testified that Doyle drove them to
Denton Community Hospital, but Stephanie was not at that hospital.  Afterwards, they stopped at Kesey=s
grandmother=s house, and Kesey came out with
a gun, which turned out to be a pellet gun. 
Justin stated to the group that he would pistol-whip Stephanie with
it.  Then, the group went to Denton
Regional Hospital and found out that Stephanie was there.  Tymeshia told Doyle to wait in the car
because Tymeshia did not think that Stephanie would come with them if she saw
Doyle.  Tymeshia went to Stephanie=s
hospital room and told her that Jerry was in jail.  Tymeshia said that Jerry told her and Dale to
come to the hospital and get Stephanie. 
Dale stayed with Stephanie at the hospital; Tymeshia drove the group
around in Doyle=s car, waiting for Stephanie to
be discharged.  After getting money, gas,
and cigarettes, the group discussed where they would take Stephanie.  Justin mentioned a trailer park near the
hospital, and they went there to get a brick to use to knock out
Stephanie.  Tymeshia confirmed that this
conversation was held while Doyle was present. 









Doyle suggested a plan for how Tymeshia could
pick up Stephanie; Tymeshia would drop off Doyle, Justin, and Kesey at the
hospital entrance, pick up Stephanie from the hospital, and then pick up the
group on the way out.  The group enacted
this plan, and as soon as everyone was in the car, Kesey started punching
Stephanie Areally hard.@  Doyle, who was in the front passenger seat,
turned around to watch and told Tymeshia to drive towards the highway.  Tymeshia turned up the music while Kesey was
hitting Stephanie, and Doyle turned down the music.  Doyle said, ANo, I
want to hear this bitch scream.@  Tymeshia testified that all three men were
punching Stephanie. Doyle yelled at Stephanie and told her that she needed to
apologize to Doyle=s baby, that she had warned
Stephanie Aabout fucking with Jerry,@ and
that Jerry had sent them to do this to her. 
Stephanie said that she was sorry and that she was not going to mess
with Jerry anymore.  Doyle turned around
and started hitting Stephanie, punching her Ahead and
stuff.@  Tymeshia testified that Kesey burned Stephanie
with a cigarette and that Dale burned Stephanie with a lighter.[2]  Dale and Kesey placed a belt around Stephanie=s neck
and choked her.        They drove around
for an hour or more, looking for a place to drop off Stephanie.  Doyle suggested Tasia=s house.  Tymeshia said that when they arrived at Tasia=s,
Stephanie was not responding and seemed unconscious. Tymeshia mentioned that
Tasia was going to Aget her paper,@ which
was Doyle=s phrase.  However, Tasia=s dad
came out and told Tasia that she could not leave.  








Doyle told Tymeshia where to drive, and they
ended up at a field near a trailer park. 
Everyone got out of the car, and Dale drug Stephanie out of the car by a
belt placed around her neck and laid her face down behind a dirt pile. Kesey
stepped on Stephanie=s back and shoulders, and Dale
tried to break Stephanie=s neck.  Tymeshia saw Justin stomping on
Stephanie.  Kesey took off Stephanie=s shirt
and wrapped it around her head, and both Kesey and Dale used the shirt to try
to twist Stephanie=s neck.  Kesey said, AThe
bitch won=t die.@  So, they turned over Stephanie, and Doyle
retrieved a pair of cosmetology scissors from her car.  Doyle handed the scissors to Dale, and he
started stabbing Stephanie.  Dale stabbed
Stephanie=s throat and began cutting her
throat.  Tymeshia heard air release when
Dale cut Stephanie=s windpipe. Someone said that
Stephanie was dead, and the group got back in the car.  As Doyle drove away, the group realized that
they did not have Stephanie=s
hospital band; they went back, and Dale retrieved it.  During the drive to Doyle=s house,
Tymeshia recalled that Doyle told them not to worry about itCAnobody[=s] going
to find out@; Ait=s over
and done.@ 

When they arrived at Doyle=s house,
Dale and Kesey took showers because they were soaked in Stephanie=s
blood.  Tymeshia used a bag to gather up
everyone=s
clothes and shoes, along with Stephanie=s shirt
and hospital band, and the scissors. 
They all went to a car wash to clean out the car, and Tymeshia saw a lot
of blood on the back seat.  The next day,
they used bleach and a powder cleaner from Brian=s house
to clean the car.  Dale and Justin took
out the backseat of the car and cut out the seatbelts.  Tymeshia threw the landscape brick in Dale=s
backyard and they used the barbecue grill to burn everything in the bag that
they had collected the day before.  The
next time that Tymeshia saw Doyle, Doyle told her about taking Tasia to see if
Stephanie was dead. 








Tymeshia said that when this chain of events
started, she did not expect Stephanie to die; all along, the plan was for a
fight, and there was never any talk of killing Stephanie.  However, Tymeshia confirmed that throughout
the ordeal Doyle never indicated she was having second thoughts about Stephanie=s
beating. 

III.  Factually Sufficient Evidence to Support
Conviction

In her first issue, Doyle argues that the
evidence is factually insufficient to support her conviction for capital
murder.  The crux of Doyle=s
contention is that there is insufficient evidence to corroborate Tymeshia=s
accomplice witness testimony and that, absent this testimony, insufficient
evidence exists to prove that she was criminally responsible as a party or
co-conspirator.[3]  








The court of criminal appeals has held that the
accomplice witness rule, Texas Code of Criminal Procedure article 38.14,[4]
is a statutorily imposed sufficiency review that is not derived from federal or
state constitutional principles that define the legal and factual sufficiency
standards.  Cathey v. State, 992
S.W.2d 460, 462-63 (Tex. Crim. App. 1999), cert. denied, 528 U.S. 1082
(2000).  The accomplice witness rule is
satisfied if there is some non-accomplice evidence that tends to connect the
accused to the commission of the offense. 
Gill v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (citing Gosch
v. State, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991), cert. denied,
509 U.S. 922 (1993)).  The corroborative
evidence need not directly link the accused to the crime or be sufficient in
itself to establish guilt beyond a reasonable doubt.  Id. at 48; Gosch, 829 S.W.2d at
777.  The corroborative evidence may be
circumstantial or direct.  Gosch,
829 S.W.2d at 777; Paulus v. State, 633 S.W.2d 827, 843 (Tex. Crim. App.
[Panel Op.] 1981).

Although an appellant=s
presence with the accomplice witnesses before and after the offense is
insufficient to corroborate the accomplice witness=s
testimony, it is an important circumstance to be considered.  Cox v. State, 830 S.W.2d 609, 611
(Tex. Crim. App. 1992); see, e.g., Gill, 843 S.W.2d at 49.  Motive and opportunity to commit the offense
may be evidence which connects the accused to the offense.  Cox, 830 S.W.2d at 612; Paulus,
633 S.W.2d at 846.  Moreover, ill will
toward the deceased may be a factor which may corroborate accomplice witness
testimony.  See, e.g., Rodriquez v.
State, 508 S.W.2d 80, 83 (Tex. Crim. App. 1974).








Judicial experience shows that no precise rule
exists to measure the amount of evidence required to corroborate accomplice
witness evidence.  Gill, 873
S.W.2d at 48.  Each case must be
evaluated on its own unique facts.  Id.  All facts and circumstances may be looked to
as furnishing the necessary corroboration. 
Mitchell v. State, 650 S.W.2d 801, 807 (Tex. Crim. App. 1983), cert.
denied, 464 U.S. 1073 (1984).

We begin our analysis by determining whether the
State met its burden under article 38.14 to offer non-accomplice witness
evidence tending to connect Doyle with the offense.  Under the requirements of article 38.14, we
eliminate the evidence offered by the accomplice witness, here Tymeshia, from
our analysis and examine the other evidence to determine if there is incriminating
evidence that tends to connect Doyle as a party or co-conspirator to the
commission of the capital murder.  See
Hernandez v. State, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997).

The record reveals that numerous non-accomplice
witnesses heard Doyle make a threat against Stephanie.  Dale was heard to say before they left for
the hospital in Doyle=s car that he would kill
Stephanie, and no one, including Doyle, attempted to deviate from that
plan.  There was no evidence admitted
that Doyle was not present during any of the acts that the group perpetrated
against Stephanie.  Instead, throughout
the events, Doyle led the group and provided them with a means of
transportation.








The direct evidence from the hospital
surveillance cameras showed  Doyle,
Tymeshia, and Dale at the hospital. 
Tasia=s testimony corroborated
Tymeshia=s
testimony that Doyle hit Stephanie and that the men hit Stephanie with a brick
and a gun, beat her, burned her with a cigarette, and choked her.  Tasia testified that she saw Stephanie in
Doyle=s car,
and her description of Stephanie=s
condition at that time was consistent with Stephanie having been beaten
badly.  Tasia also saw blood on Doyle=s
hands.  Tasia=s
additional testimony based on Doyle=s
statements to herCthat Stephanie had been dragged
from the car by a belt; that the men attempted to break Stephanie=s neck,
and did cut her throat and stab her with scissors; that the group left
Stephanie in a vacant lot; and that the group destroyed evidence to cover up
the crimeCfurther corroborates Tymeshia=s
testimony regarding Doyle=s participation in the acts that
led to Stephanie=s death.  After the group left Stephanie=s body
in the lot, Tasia was able to lead her ex-boyfriend to the lot because Doyle
had taken her to that location the day after the murder.  Furthermore, the brick, the evidence
collected from Doyle=s car, and the autopsy added
additional corroboration to Tymeshia=s
description of the September 2002 events connecting Doyle to the commission of
the acts resulting in Stephanie=s death.








Excluding Tymeshia=s
testimony, as mandated by article 38.14, the remaining evidence sufficiently
corroborates Tymeshia=s accomplice witness testimony
and satisfies the requirements of article 38.14.  See Mitchell, 650 S.W.2d at 808
(holding that evidence independent of accomplice witnesses tended to connect
appellant with crime charged and sufficiently corroborated accomplice witness=s
testimony).  We hold that Tymeshia=s
accomplice witness testimony was sufficiently corroborated. 

We now analyze whether, considering all of the
evidenceCincluding
Tymeshia=s
sufficiently corroborated accomplice witness testimonyCfactually
sufficient evidence exists to support the jury=s
determination that Doyle was criminally responsible for Stephanie=s murder
as a party or co-conspirator.  See
Tex. Penal Code Ann. ''
7.01-.02 (Vernon 2003) (listing criminal responsibility for parties and for
conduct of another).[5]  








In reviewing the factual sufficiency of the
evidence to support a conviction, we are to view all the evidence in a neutral
light, favoring neither party.  See
Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual
sufficiency review is whether, considering the evidence in a neutral light, the
fact finder was rationally justified in finding guilt beyond a reasonable
doubt.  Id. at 484.  There are two ways evidence may be factually
insufficient:  (1) the evidence
supporting the verdict or judgment, considered by itself, is too weak to
support the finding of guilt beyond a reasonable doubt; or (2) when there is
evidence both supporting and contradicting the verdict or judgment, weighing
all of the evidence, the contrary evidence is so strong that guilt cannot be
proven beyond a reasonable doubt.  Id.
at 484-85.  AThis
standard acknowledges that evidence of guilt can >preponderate= in
favor of conviction but still be insufficient to prove the elements of the
crime beyond a reasonable doubt.@  Id. at 485.  In other words, evidence supporting a guilty
finding can outweigh the contrary proof but still be insufficient to prove the
elements of an offense beyond a reasonable doubt.  Id. 








In performing a factual sufficiency review, we
are to give deference to the fact finder=s
determinations, including determinations involving the credibility and demeanor
of witnesses.  Id. at 481; Cain
v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for that
of the fact finder=s.  Zuniga, 144 S.W.3d at 482.  

A proper factual sufficiency review requires an
examination of all the evidence.  Id.
at 484, 486-87.  An opinion addressing
factual sufficiency must include a discussion of the most important and
relevant evidence that supports the appellant=s
complaint on appeal.  Sims v. State,
99 S.W.3d 600, 603 (Tex. Crim. App. 2003).








The accomplice witness testimony of Tymeshia made
a case of capital murder as a party or co-conspirator against Doyle.  Tymeshia=s
testimony revealed Doyle=s continuing role in the murderCfrom the
planning stages with the threats to get Stephanie; to the group=s
kidnaping of Stephanie; through the actual killing, in which Doyle handed over
the scissors that were used to inflict the lethal cut to Stephanie=s
throat; to Doyle=s participation in covering up
the crime.  Additionally, there were numerous
witnesses who placed Doyle with Stephanie before the murder and who described
Doyle=s ill
will toward Stephanie for dating the father of Doyle=s
child.  Moreover, Tasia testified that
she saw Stephanie, still alive, crumpled up in the back seat of Doyle=s car
with the group; she saw Stephanie=s body
after Stephanie was murdered; and heard Doyle=s story
of the murder after Stephanie died.

Viewing all the evidence in a neutral light,
favoring neither party, we conclude that factually sufficient evidence exists
supporting the elements necessary for the jury to find Doyle guilty of murder
as a party or co-conspirator.  See
Tex. Penal Code Ann. ''
7.01-.02.  Evidence supporting the
verdict, taken alone, is not too weak to support the finding of guilt beyond a
reasonable doubt, and the contrary evidence is not so strong that guilt cannot
be proven beyond a reasonable doubt.  Dotson
v. State, 146 S.W.3d 285, 295 (Tex. App.CFort
Worth 2004, pet. ref=d); see also Meeks v. State,
135 S.W.3d 104, 112-13 (Tex. App.CTexarkana
2004, pet. ref=d) (finding sufficient
corroborating evidence of accomplice testimony that tends to connect appellant
to offense and holding evidence factually sufficient).  We overrule Doyle=s first
issue.

IV.  No Harm Resulted From Limitations on Voir
Dire Questioning

During voir dire, the following exchange took
place:

[DEFENSE COUNSEL:] Okay.  Now,
having B again, having done this
a while, I=ve heard any number of
responses to the question of can you consider the full range of
punishment.  Specifically, can you grant
probation to this defendant if you found her guilty of murder and you believed
it was the right thing to do?

 

[PROSECUTOR:] Objection to improper question.

 








THE COURT:  Sustained.

 

[DEFENSE COUNSEL:] Sorry.  Can
you assess a sentence if you found a defendant guilty of murder B can you assess [her]
sentence at probation if you believed that it was the proper sentence to set?

 

[PROSECUTOR:] Same objection.

 

THE COURT:  Sustained.  You=re asking them if they can grant it or assess it,
and the law requires them to be able to consider it.

 

[DEFENSE COUNSEL:] And I apologize for that.  That is correct.

 

What I need to find out is, can you consider probation for a defendant
that you found guilty of the offense of murder if you believed it was the
proper thing to do?  Now, I have actually
heard in response to this question before someone say, well, sure, if I found
them not guilty.  It doesn=t work that way.  Not guilty, they go home.  Okay. 
We=re talking about somebody
that, yes, indeed, you did find guilty of the offense, the lesser, in this case
the offense of murder.

 

So let me ask Mr. Shelton. 
Could you consider probation if you found the defendant guilty of murder
if you thought it was the proper thing to do?

 

VENIREPERSON:  Yes.

 

[DEFENSE COUNSEL:] Mr. Moses?

 

VENIREPERSON:  Yes.

 

[DEFENSE COUNSEL:] Mr. Kirwan?

 

VENIREPERSON:  Yes.

 

[DEFENSE COUNSEL:] Mr. Cott?








VENIREPERSON:  Yes, sir.

 

[DEFENSE COUNSEL:] Ms. Howard?

 

VENIREPERSON:  Yes.

 

[DEFENSE COUNSEL:] Mr.Moore?

 

VENIREPERSON:  Yes.

 

[DEFENSE COUNSEL:] Ms. Santos?

 

VENIREPERSON:  Yes.

 

[DEFENSE COUNSEL:] Ms. Fish?

 

VENIREPERSON:  I=m not real clear on that
one.

 

[DEFENSE COUNSEL:] Okay. 
Obviously B

 

VENIREPERSON:  If they have been
found guilty of murder, would I consider probation?

 

[DEFENSE COUNSEL:] The law requires that you consider the full range
of punishment, which would include B which would include probation for murder.  

 

VENIREPERSON: I would consider it. 
I would follow the law and consider it.

 

[DEFENSE COUNSEL:] And if you felt it was proper, could you give it?

 

[PROSECUTOR:] I object to improper question.

 

THE COURT:  Sustained.

 

[DEFENSE COUNSEL:] Your Honor, I believe I=m entitled to ask that in
the proper circumstances, not only would they consider it but would they give
it.








THE COURT: I don=t believe that you can
ask that question.  That=s why I sustained the
objection.

 

[DEFENSE COUNSEL:] I understand. 
We=ll leave it with that.

 

Can you consider
probation?

 

VENIREPERSON: I could consider probation.

 

In her third issue, Doyle maintains that the
trial court erred by limiting the voir dire questions intended to establish
whether the venirepersons were qualified as to the range of punishment,
including probation.  Specifically, Doyle
complains that she should have been allowed to ask the venirepersons whether
they could Agive or grant@
probation if warranted by the proper circumstances and that the restriction
placed on her voir dire examination resulted in a Sixth Amendment
violation.  The State responds that Doyle=s
question to the venirepersons as to whether they could give probation
constituted an improper commitment question. 








The trial court has broad discretion over the
process of selecting a jury.  Barajas
v. State, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).  Therefore, appellate courts should not
disturb a trial court's ruling on the propriety of a particular question during
voir dire absent an abuse of discretion. 
Id.; Harris v. State, 122 S.W.3d 871, 878 (Tex. App.CFort
Worth 2003, pet. ref=d).  A trial court abuses its discretion if it
prohibits a proper question regarding a juror's views on an issue applicable to
the case.  Howard v. State, 941
S.W.2d 102, 108 (Tex. Crim. App. 1996), cert. denied, 535 U.S. 1065
(2002).  Additionally, a trial court
abuses its discretion if it allows a question that attempts to commit the juror
to a particular verdict based on a set of circumstances analogous to the case
in question.  See Atkins v. State,
951 S.W.2d 787, 789 (Tex. Crim. App. 1997); see generally Standefer v. State,
59 S.W.3d 177, 179-84 (Tex. Crim. App. 2001) (setting forth three-prong test
for determining improper commitment questions). 








Here, we decline to engage in the Standefer
analysis for determining whether the questions asked were proper or improper
commitment questions.  Assuming that
Doyle was denied the ability to pose a proper question to the venire on
probation, we apply a rule 44.2 analysis to determine the harm.  See Rich v. State, 160 S.W.3d 575, 577
(Tex. Crim. App. 2005) (stating that trial court=s
impermissible exclusion of a proper question during jury voir dire is subject
to a harmless error analysis).  The
trial court in this case assessed punishment, not the jury; we can conceive
of no manner in which this alleged error influenced the jury=s
verdict at guilt-innocence.  Doyle has
offered no explanation concerning how her substantial rights were affected by
the alleged improper limitation on voir dire when the trial court assessed her
punishment.  The jurors= alleged
inability to give or grant probation[6]
is not linked to any supposed bias to improperly convict her.  After considering the entire record,
including the accomplice witness testimony, physical evidence admitted for the
jury=s
consideration, the nature of the evidence supporting the verdict set forth
above, the character of the alleged error and how it might be considered in
connection with other evidence in the case, the jury instructions, the State=s theory
and any defensive theories, closing arguments, voir dire, and whether the State
emphasized the error, we cannot say that the trial court=s error,
if any, in restricting voir dire was harmful. 
See id. at 577-78. 
Therefore, we overrule Doyle=s third
issue.

V.  Failure to Raise Juror Disqualification
Precludes Reversal

During the break after the State concluded its
voir dire, Mr. Moses, one of the venirepersons, requested to speak to the
attorneys: 

THE COURT:  Mr. Moses, what did
you want to tell us, sir?

 

VENIREPERSON:  What I talked to
you about this morning.  Back in 1967, I
was B

 

THE COURT:  Ma=am, are you a juror in
this case?

 

UNIDENTIFIED WOMAN: No.

 

(Woman left the
courtroom)

 

THE COURT: Go ahead.

 








VENIREPERSON: Back in 1967 in Vietnam, I had a general court martial
for misappropriation, felony offense, government funds, 30 days.  I didn=t go to the brig, but I just wanted B the scenario you brought
up this morning, I just wanted to bring it up to make sure that if it came out
later something wasn=t B yeah, I just wanted you
to know.  I was broken one rank and got
it back in 30 days and got an honorable discharge.  So I just wanted you to know.

 

THE COURT:  Okay.  Let me see if they have any questions.

[PROSECUTOR], do you have
any questions?

 

[PROSECUTOR:] No, Your Honor.

 

THE COURT: [DEFENSE COUNSEL], do you have any questions?

 

[DEFENSE COUNSEL:] Was this a proceeding of some sort that they had, a
court martial basically?

 

VENIREPERSON: Yeah, general B it=s just when you have B I=m about to choke to
death.

 

You just have one commanding officer, and he pronounces judgment.  I just did something stupid and got
caught.  Got drunk and got B we were mad at a
gentleman, and did some stupid things.  I
shouldn=t have done it.  And that was in 1967.  And like I said, I got my rank back within 30
days, and I was B I have an honorable
discharge.

 

THE COURT: And in fact, you told me this morning you=ve served on juries since
then, correct, sir?

 

VENIREPERSON: Yes, ma=am.  But I B I try to make sure that
everybody knows just so that it=s not a problem.

 

[DEFENSE COUNSEL:] We appreciate your sharing with us.

I have no questions.

 

THE COURT: Thank you, sir.








At the conclusion of Doyle=s voir
dire, the trial court read the names of the twelve jurors, including Mr.
Moses.  After the jury convicted Doyle,
she filed a motion for new trial and an amended motion for new trial, alleging
that she had suffered significant harm by Mr. Moses=s
service, because he was allegedly a disqualified juror. 

In her fourth and fifth issues, Doyle contends
that the trial court committed reversible error by allowing Mr. Moses to sit on
the jury and by refusing to allow her to review his juror information
card.  The State responds that the trial
court impliedly found that Mr. Moses was not absolutely disqualified, that the
trial court did not abuse its discretion based upon the information before it,
and that Doyle was not entitled to disclosure of Mr. Moses=s
personal information because she failed to show good cause. 








A juror is absolutely disqualified if it appears
that he had been convicted of theft or any felony.  See Tex.
Code Crim. Proc. Ann. arts. 35.16(a) (Vernon Supp. 2005), 35.19 (Vernon
1989).  We apply an abuse of discretion
standard when reviewing a trial court=s ruling
on whether a juror is absolutely disqualified. 
Chambers v. State, 903 S.W.2d 21, 27 (Tex. Crim. App. 1995); Hammond
v. State, 799 S.W.2d 741, 744-45 (Tex. Crim. App. 1990), cert. denied,
501 U.S. 1259 (1991); Loughry v. State, 926 S.W.2d 382, 384 (Tex. App.CFort
Worth 1996, pet. ref=d).  A trial court=s ruling
on an absolute disqualification is a question of fact.  Chambers, 903 S.W.3d at 27; Hammond,
799 S.W.2d at 744-45; Loughry, 926 S.W.2d at 384.

A conviction in a criminal case may be reversed
on appeal on the ground that a juror in the case was absolutely disqualified
from service if (1) the defendant raises the disqualification before the
verdict is entered or (2) the disqualification was not discovered or brought to
the attention of the trial court until after the verdict was entered and the
defendant makes a showing of significant harm by the service of the
disqualified juror.  Tex. Code Crim. Proc. Ann. art. 44.46
(Vernon Supp. 2005).  Thus, the first
issue presented here is whether Doyle raised the disqualification issue before
or after the verdict was entered.








Mr. Moses came forward on his own accord to
discuss with the parties his general court martial for misappropriation of
government funds.  As shown by the
testimony above, Doyle=s attorney asked one question,
the court asked one question, and neither the State nor Doyle challenged Mr.
Moses or objected to him serving on the jury. 
Doyle urges us to conclude that her single inquiry into the nature of
the proceedingCthat is, whether it was a court
martialCconstitutes
Araising@ the
issue of absolute disqualification before the verdict was entered for purposes
of article 44.46.[7]  Id.  However, according to the
Texas Court of Criminal Appeals, this single question falls short of the
statutory criteria necessary to Araise@ a
disqualification issue.  See Nelson v.
State, 129 S.W.3d 108, 111, 113 (Tex. Crim. App. 2004). 

Nelson v. State involved
facts almost identical to the present facts. 
Id. at 109.  In Nelson,
the Amarillo Court of Appeals held that a juror=s
statements about his possible disqualification and a defense counsel=s
subsequent conference with the judge and prosecutor satisfactorily Araised@ the
issue of juror disqualification before the verdict was rendered.  See id. at 110 (stating that the
ground of the juror=s disqualification was preserved
for review).  The court of criminal
appeals reversed, holding that the disqualification issue had not been Araised@CNelson
did not assert an objection to the juror=s
qualifications and instead told the court that he had no objection to the
juror.  Id. at 113.  The court of criminal appeals held that
Nelson Acould
have raised, but did not raise, the disqualification before the verdict was
entered@Cthat is,
the juror=s statements and defense counsel=s
conference with the judge and prosecutor did not Araise@ the
issue, a specific objection was required. 
Id.













Here, as in Nelson, after Mr. Moses
disclosed that he had been subjected to a court martial for misappropriation of
government funds, Doyle made no objection and did not challenge Mr. Moses.  Consequently, Doyle, like Nelson, did not Araise@
disqualification before the verdict was entered.  Although the possibility of a juror=s
absolute disqualification may come to light during voir dire, article 44.46(1)
requires Athe defendant@ to
raise the objectionability of the juror in some way prior to entry of the
verdict.  Tex. Code Crim. Proc. Ann. art. 44.46(1); see Nelson,
129 S.W.3d at 111-13; Hernandez v. State, 952 S.W.2d 59, 71 (Tex. App.CAustin
1997) (holding that, although possibility of juror=s
disqualification was raised during voir dire, defense did not object to juror
or seek his removal), judgm=t
vacated on other grounds, 957 S.W.2d 851 (Tex. Crim. App.
1998).  Because Mr. Moses=s
potential disqualification was disclosed during voir dire, Doyle cannot fall
under article 44.46's second standard for reversalCapplicable
when disqualification is not discovered until after entry of the verdict.  Tex.
Code Crim. Proc. Ann. art. 44.46(2). 
According to Nelson, our analysis concludes here.  See 129 S.W.3d at 113.  Doyle=s
failure to Araise@ the
issueCMr.
Moses=s
possible disqualification that she learned of before the verdictCby an
objection to his qualifications or service means that her judgment of
conviction may not be reversed under article 44.46.  See id.  Moreover, because we do not proceed to an
article 44.46(2) analysis, we need not analyze Doyle=s fifth
issue claiming she needed Mr. Moses=s juror
information card to show significant harm under article 44.46(2).

We hold that the trial court did not err by
allowing Mr. Moses to sit on the jury or by refusing to allow Doyle to review
Mr. Moses=s juror information card.[8]  We overrule Doyle=s fourth
and fifth issues.

VI.  Photograph Was Not More Prejudicial Than
Probative

In her second issue, Doyle argues that the trial
court erred by admitting into evidence a gruesome photograph of Stephanie after
her death.  Specifically, Doyle contends
that the probative value of such photograph was substantially outweighed by the
danger of unfair prejudice. 

The admissibility of a photograph is within the
sound discretion of the trial judge.  Paredes
v. State, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004).  We will not disturb a trial court=s ruling
admitting or excluding evidence so long as its decision falls within the Azone of
reasonable disagreement.@ 
See Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App.
1991) (op. on reh=g).













Under Texas Rule of Evidence 403, relevant
evidence may be excluded if its probative value is substantially outweighed by
the danger of unfair prejudice.  Tex. R. Evid. 403.  A rule 403 analysis by the trial court should
include, but is not limited to, the following considerations:  (1) the probative value of the evidence; (2)
the potential to impress the jury in some irrational, yet indelible, way; (3)
the time needed to develop the evidence; and (4) the proponent=s need
for the evidence.  Erazo v. State,
144 S.W.3d 487, 489 (Tex. Crim. App. 2004). 
A court may consider the following factors in determining whether the
probative value of a photograph is substantially outweighed by the danger of
unfair prejudice:  the number of
photographs, the size of the photograph, whether it is in color or black and
white, whether it is gruesome, whether the body is naked or clothed, and
whether the body has been altered by autopsy. 
Reese v. State, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000). Where pictorial evidence will help the jury to
understand verbal testimony, such as the technical language used by a medical
doctor in describing the injuries sustained by a victim of a crime, the
photograph is generally admissible.  Harris
v. State, 661 S.W.2d 106, 107 (Tex. Crim. App. 1983).  Photographs that depict the nature, location,
and extent of a wound have been declared probative enough to outweigh any
prejudicial effect.  Legate v. State,
52 S.W.3d 797, 807 (Tex. App.CSan
Antonio 2001, pet. ref=d).  Overall, the photograph must be helpful to
the jury; A[i]f there are elements of a
photograph that are genuinely helpful to the jury in making its decision, the
photograph is inadmissible only if the emotional and prejudicial aspects
substantially outweigh the helpful aspects.@  Erazo, 144 S.W.3d at 491-92.

State=s
Exhibit 21 is a close-up of Stephanie=s head,
focusing on the facial injuries themselves. 
The trial court admitted and published the color photograph to the jury
after Detective Barrett testified regarding where and how Stephanie was found;
a substantial amount of time was not spent discussing the photograph.  The probative value of the photograph is
high.  It provides strong visual evidence
corroborating the testimony of Tymeshia, Detective Barrett, and a portion of
Tasia=s
testimony concerning how Stephanie was murdered, the injuries inflicted with
the cigarettes, and the ultimate result of the events that took place on
September 15, 2002.  As the court of
criminal appeals has stated, AVisual
evidence accompanying testimony is most persuasive and often gives the fact
finder a point of comparison against which to test the credibility of a witness
and the validity of his conclusions.@  Chamberlain v. State, 998 S.W.2d 230,
237 (Tex. Crim. App. 1999), cert. denied, 528 U.S. 1082 (2000).  Thus, although the photograph arguably
depicts Adisagreeable
realities,@ A[it]
depict[s] nothing more than the reality of the brutal crime committed@ and
helped the jury to understand the verbal testimony.  Id. 









We hold that the probative value of State=s
Exhibit 21 is not substantially outweighed by its prejudicial effect.  See Tex.
R. Evid. 403, Frank v. State, No. 2-04-069-CR, 2005 WL 3526564,
at *10 (Tex. App.CFort Worth Dec. 22, 2005, no
pet. h.) (holding probative value of State=s
Exhibit 21Cthe same photograph of Stephanie
that was admitted in the trial of Kesey FrankCwas not
substantially outweighed by its prejudicial effect).  Thus, the trial court did not abuse its
discretion by admitting State=s
Exhibit 21.  See Paredes, 129 S.W.3d
at 539; Frank, 2005 WL 3526564, at *10. 
We overrule Doyle=s second issue.

VII.  Conclusion

Having overruled each of Doyle=s five
issues, we affirm the trial court=s
judgment.

 

SUE
WALKER

JUSTICE

 

PANEL B:   LIVINGSTON, DAUPHINOT, and WALKER, JJ.

 

DO NOT PUBLISH

Tex.
R. App. P.
47.2(b)

 

DELIVERED: January 5,
2006











[1]At the conclusion of the
State=s direct examination,
Tymeshia admitted that she had lied in previous statements to the police to
protect herself, Doyle, and Justin.  She
stated that she came to testify at trial because she wanted to take
responsibility for her actions. 





[2]On cross-examination,
Tymeshia admitted that she never saw Stephanie being burned, but she remembered
Dale saying that he burned Stephanie in the eye.  





[3]The court=s charge to the jury
contained instructions on criminal responsibility as a party and as a
co-conspirator. 





[4]The accomplice witness
rule provides that A[a] conviction cannot be
had upon the testimony of an accomplice unless corroborated by other evidence
tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.@  Tex.
Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).





[5]Under section 7.01(a),
which sets forth the law of parties, a person is 

criminally responsible as a party to an offense
if the offense is committed by his own conduct, by the conduct of another for
which he is criminally responsible, or by both. 
Tex. Penal Code Ann. ' 7.01(a).  Section 7.02 reads as follows:

 

(a) A person is
criminally responsible for an offense committed by the conduct of another if:

 

(1) acting with the kind
of culpability required for the offense, he causes or aids an innocent or
nonresponsible person to engage in conduct prohibited by the definition of the
offense;

 

(2) acting with intent to
promote or assist the commission of the offense, he solicits, encourages,
directs, aids, or attempts to aid the other person to commit the offense; or

 

(3) having a legal duty
to prevent commission of the offense and acting with intent to promote or
assist its commission, he fails to make a reasonable effort to prevent
commission of the offense.    

 

(b) If, in the attempt to
carry out a conspiracy to commit one felony, another felony is committed, by
one of the conspirators , all conspirators are guilty of the felony actually
committed, though having no intent to commit it, if the offense was committed
in furtherance of the unlawful purpose and was one that should have been
anticipated as a result of the carrying out of the conspiracy.

 

Tex.
Penal Code Ann.
' 7.02.





[6]None of the jurors stated
that they could not consider probation.





[7]Although the State, in
its brief and during oral argument, conceded that the issue of Mr. Moses=s qualification was
discussed, the State points out that Doyle did not challenge Mr. Moses or
object in any way to seating him and argues that Doyle has not suffered
significant harm from Mr. Moses=s jury service. 
In other words, the State agrees that the possibility of Mr. Moses=s disqualification came
up during voir dire but not that the technical requirements of article 44.46(1)
were met.  Id.





[8]Moreover, based on the
information before it, the trial court could have concluded that the offense
that Mr. Moses described did not render him absolutely disqualified.  See Tex.
Code Crim. Proc. Ann. art. 35.16(a), 35.19.